UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEITH PROKUP, individually and on behalf of all similarly situated persons,<br><br>                       Plaintiff,<br><br>    v.<br><br>HUEL INC., a Delaware corporation,<br><br>                       Defendant. | Case No. 1:25-cv-6091<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Keith Prokup ("Plaintiff"), individually and on behalf of all others similarly situated, brings this class action complaint against Defendant Huel Inc. ("Defendant"). The allegations asserted herein are based on Plaintiff's personal knowledge of facts pertaining to himself and upon information and belief, including further investigation conducted by Plaintiff's counsel, as to the remainder.

## I.     NATURE OF THE ACTION.

1.      Plaintiff respectfully commences this class action to address Defendant's deceptive business practice of marketing and selling certain protein powder products which contain or risk containing significant levels of heavy metals—specifically, lead and cadmium—despite affirmatively mispresenting otherwise. The products at issue are Defendant's Huel Black Edition Protein Powders (the "Products").

2.      Defendant is a manufacturer and seller of premium protein powder supplements. Plaintiff is one of many consumers who purchased protein powder for regular and ordinary use.

3.      Prior to marketing and selling the Products, Defendant knew the Products contained or risked containing significant levels of lead and cadmium. Yet Defendant omitted this information on packaging and failed to warn about the significant presence or risk of presence of lead and cadmium, despite advertising the Products to the contrary.

4.      Plaintiff and Class Members reasonably relied on Defendant's representations and partial omissions which led them to believe the Products were without detectable levels of heavy metals, let alone significant or unsafe levels.

5.      Plaintiff and Class Members purchased and/or used the Products and were therefore exposed to, or risked being exposed to, significant levels of lead and cadmium.

6.     The heavy metals are avoidable constituents in the Products and Defendant's manufacturing process.

7.     Defendant is therefore liable to Plaintiff and Class Members for selling, advertising, manufacturing, and distributing the Products with affirmative misrepresentations and without conspicuously disclosing that the Products contain or risk containing significant levels of certain toxic heavy metals.

## II.    PARTIES.

8.     Plaintiff Keith Prokup is, and at all times relevant to this action was, a resident of Cook County, Illinois. Plaintiff therefore is a citizen/domiciliary of Illinois.

9.     Defendant Huel Inc. is a Delaware corporation with its principal place of business in Brooklyn, New York.  Defendant sells, manufactures, and distributes the Products.

## III.    JURISDICTION AND VENUE.

10.     This Court has jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a proposed class action in which: (i) there are at least 100 class members; (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (iii) at least one putative class member and one Defendant are citizens of different states.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims herein occurred in this judicial district. Defendant is headquartered in this district and markets and sells the products to consumers in this district.

12.     Further, as set forth herein, Defendant has contacts in this forum sufficient to subject it to personal jurisdiction. Defendant continuously and systematically places goods into the stream of commerce for distribution nationwide, including in New York, offers to ship products to

New York, markets the Products to persons in New York, and manufactures and supplies the Products to third-party sellers to sell to consumers in New York. Exercising jurisdiction over Defendant is fair, just, and reasonable considering the quality and nature of Defendant's acts that occur in New York, and which affect interests located in New York. Defendant has purposefully availed itself of the privilege of conducting activities in New York.

## IV.     FACTUAL ALLEGATIONS.

### A.     Defendant is a Prominent, Knowledgeable, and Experienced Manufacturer and Seller of Protein Supplements.

13.     Protein powders are nutritional supplements. Buyers of protein supplements consume them repeatedly, and oftentimes daily. The Products, in particular, are promoted as premium quality high protein supplements that provide a "complete meal."

14.     Defendant is among the leading protein supplement brands in the United States. On information and belief, sales of the Products nationwide total tens of millions per year.

15.     Defendant prides itself as a healthy and health-conscious brand. According to its website, "A team of experienced Nutritionists and Product Development Specialists develops all Huel products."[1] "This means every Huel meal contains a balance of all 27 essential vitamins and minerals, protein, essential fats, carbs, fiber, and phytonutrients in a single product."[2] Huel's missing is "To make nutritionally complete, convenient, affordable food, with minimal impact on animals and the environment. Huel is made from plant-based, sustainable ingredients like oats, peas, rice, flaxseed, coconut, and sunflower . . . ."[3]

---

[1] https://huel.com/pages/about-us (accessed October 29, 2025).
[2] *Id.*
[3] *Id.*

16.    Huel states "we need food that prioritizes nutrition, does not generate lots of waste, and has minimal environmental impact. But we also need it to be convenient and affordable. We believe Huel can be a solution to this problem."[4] "Huel has a long shelf life and uses minimal packaging, so it creates minimal waste. Because Huel is plant-based, it has a much lower carbon footprint than animal products. Plus, Huel is low in sugar and lactose-free (in fact, it has zero animal products). It contains no GMOs, and it is affordable."[5]

17.    Huel's website repeatedly touts its high quality and premium nature. Indeed, under the heading "Being passionate about high-product quality," Huel states "All Huel products are developed by a team of experienced Nutritionists and Product Development Specialists. They are produced using the best ingredients in facilities that meet the strictest quality standards. All our facilities and equipment are held to the highest safety standards and regulations, so you can be sure you'll be consuming top-quality nutrition."[6]

18.    And Huel's website explains its products are extensively tested: "Fueling the goals of over 4 million people worldwide [¶] Backed by science with 100+ clinically proven health benefits, rigorously tested for ideal nutrition."[7] It further states under the heading "Our quality & testing": "We've spent over a decade in pursuit of creating a high–quality Foundational Nutritional supplements. We think about quality through three considerations. And at each step of the process, we go above and beyond industry standards. . . . We conduct quality checks in our dedicated quality lab. Raw materials are tested by our specialized raw material team for key parameters including

---

[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] https://huel.com/pages/science-advisory-board (last accessed October 29, 2025).

particle size, moisture content, water activity, and organoleptic properties. This rigorous process ensures tightly controlled product quality and industry-leading consistency for our customers."[8]

**B.     Independent Study Recently Uncovers Dangerous Levels of Lead and Mercury in the Products.**

19.     Consumer Reports is a consumer safety organization and advocate that conducts independent testing of consumer goods.

20.     Consumer Reports recently tested the Products for heavy metals. The findings were published in October 2025.[9]

21.     Specifically, Consumer Reports tested at least two unique samples of Huel Black Edition Protein Chocolate, along with 22 other protein powders manufactured by other companies.[10] The tested products were "purchased between November 2024 and January 2025 from supermarkets and health food stores in New York, as well as from online retailers."[11] "The samples were transferred into brown polyethylene jars, blind coded to preserve their identities, and shipped to an independent, accredited laboratory. At the laboratory, sample preparation or mixing was performed in fume hoods known to be free of contamination from trace metals. Water, sample containers, and other materials used for the analyses were monitored for contamination to account for any biases in sample results."[12] "Testing for total protein was conducted using the Dumas

---

[8] https://huel.com/pages/quality-standards (last accessed October 29, 2025).
[9] https://www.consumerreports.org/lead/protein-powders-and-shakes-contain-high-levels-of-lead-a4206364640/ (last accessed October 29, 2025).
[10]
https://article.images.consumerreports.org/image/upload/v1761140939/prod/content/dam/CRO-Images-2025/Special%20Projects/Consumer-Reports-Protein-Powders-and-Shakes-Contain-High-Levels-of-Lead-Methodology-Test-Results-v2.pdf (last accessed October 29, 2025).
[11] *Id.*
[12] *Id.*

Method. All samples were prepared and analyzed in accordance with the Association of Official

Analytical Chemists Method 968.06."

22.     The results of Consumer Reports' testing showed that, on average, the Huel Black

Edition Chocolate contained 6.3 mcg of lead per serving, and 70.2 ppb (parts per billion) of lead.

| Product | Serving Size | Arsenic, mcg | Arsenic, ppb | Total inorganic arsenic, mcg | Total inorganic arsenic, ppb | Cadmium, mcg | Cadmium, ppb | Lead, mcg | Lead, ppb | Mercury, mcg | Mercury, ppb |
|---------|-------------|--------------|--------------|------------------------------|------------------------------|--------------|--------------|-----------|-----------|--------------|--------------|
| Huel Black Edition, Chocolate | 90 g | 1.42 | 15.8 | -- | -- | 9.21 | 102 | **6.31** | **70.2** | 0.08 | 0.9 |

## C.     Exposure to Lead and Cadmium is Hazardous and Should Be Avoided.

23.     Heavy metals bioaccumulate in the body. This means the body cannot excrete and

expel toxins as quickly as they are absorbed, so the amount present in the body—along with the

associated negative health risks—grows over time.[13]

24.     The U.S. Food and Drug Administration ("FDA") and World Health Organization

("WHO") have declared heavy metals "dangerous to human health."[14]

25.     For example, exposure to heavy metals puts children at risk for diminished mental

capacity, behavioral problems (like attention deficit hyperactivity disorder), type 2 diabetes, and

cancer, among other health issues.

_____

[13] Jesse Hirsch, *Heavy Metals in Baby Food: What You Need to Know*, Consumer Reports (June 27, 2023), available at https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/.
[14] *Staff Report: Baby Foods are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury*, U.S. House of Representatives Committee on Oversight and Reform, Subcommittee on Economic and Consumer Policy, Feb. 4, 2021 ("House Report") at 2, available at https://oversightdemocrats.house.gov/sites/democrats.oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf.

26.     Heavy metals also pose health risks to adults.  Even modest amounts of ingested heavy metals can increase the risk of cancer, cognitive and reproductive problems, and other adverse conditions.  These facts underscore the importance of limiting heavy metal exposure and consumption.

27.     It is particularly important to limit or eliminate heavy metals from household products that can be used and ingested daily, like protein powders.

***Lead***

28.     Lead in adults can suppress the immune system and cause hypertension,[15] plus "kidney damage, cardiovascular problems, reproductive damage, and brain damage, and in children can lead to brain and nervous system damage, learning disabilities, behavioral problems, and developmental delays."[16]

29.     Lead exposure can seriously harm the brain and nervous system and is associated with a range of negative health outcomes such as behavioral problems, decreased cognitive performance, delayed puberty, and reduced postnatal growth. Lead exposure can also lead to cancer.

30.     Children are at especially high risk of developing adverse effects from lead exposure due to their developing brains, and because, compared to adults, less lead is stored by the body in bones and teeth and more in the nervous system.[17]

---

[15] *Lead Poisoning*, World Health Organization (Sep. 27, 2024), https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health.

[16] Karen Feldscher, *Synthetic Braiding Hair Used by Black Women Contain Dangerous Chemicals*, Harvard T.H. Chan School of Public Health (Mar. 5, 2025), available at https://hsph.harvard.edu/news/synthetic-braiding-hair-used-by-black-women-contain-dangerous-chemicals/.

[17] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1314903

31.    No amount of lead is safe for human exposure or consumption. Indeed, according to the FDA, CDC, and WHO, there is no "safe" level of lead in blood.[18]

32.    According to the CDC, "Testing products in a laboratory is the only way to tell for certain if the product contains lead. It is best to avoid the use of products that may contain lead."[19]

33.    As noted above, bodily exposure to lead builds up over time. Buildup has been clinically shown to lead to the development of chronic poisoning, cancer, developmental, and reproductive disorders, in addition to serious injuries to the nervous system, organs, and body systems.

34.    "Because lead can accumulate in the body, even low-level chronic exposure can be hazardous over time."[20]

35.    Of note, "[r]epeated low-level exposure [to lead] over a prolonged period" can result in "chronic poisoning" and adverse symptoms including "persistent vomiting, encephalopathy, lethargy, delirium, and coma."[21] This has occurred when blood lead levels reach

---

[18] Jessica Pupovac, *Lead Levels Below EPA Limits Can Still Impact Your Health*, NPR (Aug. 13, 2016), available at https://www.npr.org/sections/thetwo-way/2016/08/13/489825051/lead-levels-below-epa-limits-can-still-impact-your-health ("No amount of lead is known to be safe."); *Lead in Food and Foodwares*, FDA, available at https://www.fda.gov/food/environmental-contaminants-food/lead-food-and-foodwares (last updated Jan. 6, 2025); *About Childhood Lead Poisoning Prevention*, Centers for Disease Control and Prevention (Mar. 13, 2025), available at https://www.cdc.gov/lead-prevention/about/index.html?CDC_AARef_Val=https://www.cdc.gov/nceh/lead/prevention/health effects.html ("There are no safe levels of lead in the blood.") (last visited Apr. 25, 2025).

[19] *About Lead in Foods, Cosmetics, and Medicines*, Centers for Disease Control and Prevention (Sep. 24, 2024), https://www.cdc.gov/lead-prevention/prevention/foods-cosmetics-medicines.html.

[20] https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf at 49.

[21] Bhasin, T. et al., *Unveiling the Health Ramifications of Lead Poisoning: A Narrative Review* (Oct. 9, 2023), available at https://www.cureus.com/articles/184381-unveiling-the-health-ramifications-of-lead-poisoning-a-narrative-review#!/.

40 to 60 µg/dl.[22] Moreover, "Elevated levels of lead exposure have been consistently associated with a range of kidney abnormalities, even when lead concentrations are relatively modest, such as around 10 µg/dl."[23] And, for context, 1 µg/dl equates to .01 ppm (parts per million) or 10 ppb (parts per billion).[24]

36.    In short, lead is extremely toxic even at low levels, and especially so over an extended time. So, lead should be avoided.

***Cadmium***

37.    "[A]ny cadmium exposure should be avoided."[25]  Exposure to even low levels of cadmium over time may build up cadmium in the kidneys and cause kidney disease and bone loss.[26]

38.    Cadmium exposure can affect the gastrointestinal system, as well as lead to hemorrhagic gastroenteritis, liver and kidney necrosis, cardiomyopathy, and metabolic acidosis.[27]

39.    Exposure to cadmium is also linked to cardiovascular disease and cancer.[28]

---

[22] *Id.*

[23] *Id.*

[24] https://www.endmemo.com/concentration_solution/microgram_deciliterpartpermillion.html.

[25] M. Nathaniel Mead, *Cadmium Confusion: Do Consumers Need Protection*? Environmental Health Perspectives, Dec. 2010, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3002210/ (last accessed October 29, 2025).

[26] *Id.*

[27] *Cadmium Toxicity: What Health Effects are Associated with Acute High-Dose Cadmium Exposure?* Agency for Toxic Substances and Disease Registry, available at https://www.atsdr.cdc.gov/csem/cadmium/Acute-Effects.html (last accessed May 11, 2023).

[28] M. Nathaniel Mead, *Cadmium Confusion: Do Consumers Need Protection?* Environmental Health Perspectives, Dec. 2010, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3002210/ (last accessed October 29, 2025).

40.     Scientists have reported a "tripling of risk for learning disabilities and special education among children with higher cadmium exposures, at exposure levels common among U.S. children."[29]

41.     Cadmium, like lead, "displays a troubling ability to cause harm at low levels of exposure."[30]  The U.S. Department of Health and Human Services has determined that cadmium and cadmium compounds are known human carcinogens and the EPA has likewise determined that cadmium is a probable human carcinogen.[31]

42.     Compounding such concerns is the fact that cadmium has a prolonged half-life as it "sequester[s] in [human] tissue."[32]

**D.    The Levels of Lead and Cadmium in the Products are Significant and Dangerous.**

43.     According to the U.S. Environmental Protection Agency ("EPA"), Maximum Contaminant Level Goals ("MCLG") are "non-enforceable health goals" based on "possible health risks."[33] The EPA also sets "an enforceable regulation called a maximum contaminant level (MCL)

---

[29] *Is Homemade Baby Food Better? A New Investigation: Tests Compare Toxic Heavy Metal Contamination in Homemade Versus Store-Bought Foods for Babies*, Healthy Babies Bright Futures, Aug. 2022, at 69 ("Healthy Babies Bright Futures Report"), available at https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2022-08/StoreVsHomemade_2022.pdf (last accessed October 29, 2025).

[30] *Id.*

[31] *Public Health Statement for Cadmium*, Agency for Toxic Substances and Disease Registry, available at https://wwwn.cdc.gov/TSP/PHS/PHS.aspx?phsid=46&toxid=15 (last accessed October 29, 2025).

[32] Stephen J. Genius et al., *Toxic Element Contamination of Natural Health Products and Pharmaceutical Preparations*, PLOS ONE, Nov. 21, 2012, available at https://doi.org/10.1371/journal.pone.0049676 (last accessed October 29, 2025).

[33] Basic Information about Lead in Drinking Water, U.S. Environmental Protection Agency, https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water (last updated May 22, 2025).

based on the MCLG. MCLs are set as close to the MCLGs as possible, considering cost, benefits and the ability of public water systems to detect and remove contaminants using suitable treatment technologies."[34]

44.    For drinking water, the EPA set the MCLG for lead at zero, and the action level[35] at 0.015 mg/L (equivalent to 0.01 ppm or 10 ppb).[36] The "EPA has set this level based on the best available science which shows there is no safe level of exposure to lead. The fact that there is no safe level of exposure underscores the fact that any action to reduce exposures can have impacts on lives and livelihoods."[37]

45.    The FDA has set "interim reference levels" designed to protect against lead toxicity for children and women of childbearing age. Those levels for lead are currently 2.2 micrograms and 8.8 micrograms per day, respectively.[38] An FDA spokesperson told Consumer Reports "there is sufficient evidence that the 8.8 micrograms per day benchmark should be applied to all adults."[39]

46.    One serving of Huel's Black Edition powder contained 6.3 micrograms of lead, or about 1,290 percent of California "safe harbor" level (which is Consumer Reports' recommended daily lead limit).

---

[34] *Id.*
[35] In lieu of a formal MCL for lead, the EPA established a "Treatment Technique" action level. *See* https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water.
[36] https://www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations
[37] https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water
[38] https://www.consumerreports.org/lead/protein-powders-and-shakes-contain-high-levels-of-lead-a4206364640/ (last accessed October 29, 2025).
[39] https://www.consumerreports.org/lead/protein-powders-and-shakes-contain-high-levels-of-lead-a4206364640/ (last accessed October 29, 2025).

47.    To put this into perspective, the average American adult is exposed to up to 5.3 micrograms of lead each day through their diet, according to a 2019 analysis published by scientists at the FDA.[40] "That means someone taking a single serving of one of these supplements daily is likely exceeding the FDA's interim reference level for dietary lead."[41]

48.    Beyond that, one serving of Huel's Black Edition plant-based protein powder also "contained 9.2 micrograms of cadmium, more than double the level that public health authorities and CR's experts say may be harmful to have daily, which is 4.1 micrograms."[42]

49.    Consumer Reports thus lists Huel as one of the "Products to Avoid."





[40]    https://www.consumerreports.org/lead/protein-powders-and-shakes-contain-high-levels-of-lead-a4206364640/ (last accessed October 29, 2025).

[41] Id.

[42]    https://www.consumerreports.org/lead/protein-powders-and-shakes-contain-high-levels-of-lead-a4206364640/ (last accessed October 29, 2025).

E.      **Protein Powders Can Be Manufactured Without Detectable Lead and Cadmium.**

50.    Based on present day manufacturing capabilities, protein powder supplements can be manufactured without detectable levels of lead and cadmium in finished products.

51.    For example, according to Consumer Reports' testing, MuscleTech 100% Mass Gainer Vanilla Milkshake did not contain detectible levels of lead. Similarly, MuscleTech 100% Mass Gainer Vanilla Milkshake, Optimum Nutrition Serious Mass Vanilla, and Transparent Labs Mass Gainer Sweet Vanilla each did not contain detectible levels of cadmium. And at minimum, there are many other protein powder supplements in the marketplace with far lower levels of lead and cadmium relative to the Products here.

52.    Accordingly, the reasonable consumer's expectations described herein are in fact reasonable and do not set an impossible standard.

F.      **Reasonable Consumers are Deceived by Defendant's Misrepresentations and Believed The Products Did Not Contain or Risk Containing Detectable, Significant, and Unsafe Levels of Heavy Metals.**

53.    Defendant's Products should not have contained (or risk containing) detectable levels of heavy metals, let alone significant levels or unsafe levels, based on the Products' labeling and advertising.

54.    As explained above, Defendant positions itself and its brand as trustworthy, safe, and responsible to consumers, and the Product itself is a premium, specialty product. Defendant's advertising and labeling is designed to reinforce this message. To that end, exemplars of the Products' packaging and advertising (collected from publicly available sources) are shown below.

# Huel Black Edition

Huel Black Edition contains 50% less carbs, 33% more protein, zero artificial sweeteners, and is naturally gluten-free. And it still contains all 27 essential vitamins and minerals, essential fats, fiber, and phytonutrients.





## More than just a meal replacement powder

Rather than simply filling you up while you're trying to lose weight, Black Edition is a meal all by itself – packed with high-quality calories, rich in nutritional content, and perfect for anyone looking to lose, maintain, "or" gain weight.

 **Complete nutrition**
Carbs, fats, protein, fiber, 27 essential vitamins & minerals.

**Plant-based**
Sustainable vegan ingredients. Zero animal products.

**Convenient**
A complete meal delivered straight to your door.

**Affordable**
Subscribe and save 20%

*Image dated April 20, 2024 (Huel.com)*

# Each Huel Black Edition meal contains...



**27 vitamins and minerals**
Bulk up your immune system with essential nutrients.

**40g protein**
100% plant-based protein from pea and brown rice.

**8g fiber & probiotics**
Supports healthy digestion and gut function.

**Gluten-free**
Made with tapioca starch, naturally gluten-free.

**No artificial sweeteners**
All-natural, <5% of daily sugar intake.

**Zinc**
For healthy skin, hair, and nails.

Nutritional information     Ingredients information

# And much more...

- ✓ Zero animal products
- ✓ 12-month shelf life
- ✓ Omega 3 and 6
- ✓ MCTs from coconut
- ✓ Palm oil-free
- ✓ Vegan vitamin D2 and D3
- ✓ Low GI
- ✓ No artificial sweeteners
- ✓ Free shipping
- ✓ Gluten-free
- ✓ Slow-release carbs
- ✓ Lactose-free
- ✓ GMO-free
- ✓ Plant-based protein
- ✓ Green tea extract

# Any questions we haven't answered?

⊖   What is Huel Black Edition?

Huel Black Edition is nutritionally complete, convenient, affordable food with minimal impact on animals and the environment. It provides you with all the carbohydrates, protein, fats, fiber, and all 27 essential micronutrients your body needs to thrive.

*Images dated April 20, 2024 (Huel.com)*



*Image dated October 29, 2025 (Amazon.com)*



*Image dated October 28, 2024 (Amazon.com)*



*Image dated October 29, 2025 (Huel.com)*



*Image dated October 29, 2025 (Huel.com)*

55.    The above representations on labeling and in advertising, taken individually and/or collectively, lead reasonable consumers to believe that the Products (1) did not contain or risk containing heavy metals in any amount, (2) were free from significant levels of toxins like heavy metals, and (3) could not materially increase negative health risks associated with heavy metals exposure if consumed regularly.

56.    Indeed, in addition to Huel's overall brand positioning, the following statements (and substantively similar statements with minor variations) taken individually and/or collectively lead reasonable consumers to believe that the Products are appropriate for regular use, do not increase negative health risks associated with heavy metals if used consumed regularly, and do not contain or risk containing detectable, significant, or unsafe levels of toxins like heavy metals.

a.  Huel.com product listing page (former version): "all the nutrients you need," "nutritionally complete," "contains all 27 essential vitamins and minerals," "no nonsense," "non-GMO," "no artificial sweeteners," "161 health benefits," and "all the carbohydrates, protein, fats, fiber, and all 27 essential micronutrients your body needs to thrive"

b.  Huel.com product listing page (current version): "high-protein complete meal," "formulated with naturally beneficial superfoods," "over 160 health  benefits," "nutritionally complete meal," "161 science-backed health benefits," "100% vegan," "non-GMO," "no artificial flavors," "no artificial colors," and "plant-based protein"

c.  Huel product labeling: "nutritionally complete powdered food with natural flavors and natural sweetener," and "nutritionally complete meal"

57.    Moreover, the list of undesired items that the Products boastfully do not contain are misleading because the Products contain or risk containing detectable and significant levels of heavy metals, and regular consumption increases health risks associated with heavy metals exposure. The overall impression is that the Products do not contain or risk containing any levels of heavy meals, let alone significant or unsafe levels when used regularly.

58.    Any reasonable consumer would consider the presence or potential presence of dangerous substances like heavy metals important information and contrary to the Products' advertising. Indeed, had the mere presence or potential presence of heavy metals been disclosed by Defendant, reasonable consumers would not purchase the Products (or would have paid much less for the Products).

59. Further, had the presence or potential presence of dangerous substances at significant and unsafe levels been disclosed by Defendant, reasonable consumers would not purchase the Products (or would have paid much less for the Products).

60. When faced with two product options in a store—one which does not contain or risk containing significant levels of heavy metals, and another which contains or risks containing significant levels of heavy metals—reasonable consumers would avoid the latter. This is because consumers value high quality products that do not contain or risk containing detectable and significant levels of toxicants. Additionally, the presence of lead and other heavy metals brings into question the Products' supposed competitive advantage—premium protein in a nutritionally complete product without undesirable qualities, which consumers can use to maintain and improve health. Because the Products are deceptively advertised, reasonable consumers are deprived of making an informed choice.

61. The above deception is particularly material in the context of protein powders. These Products are intended to be used regularly, if not daily.

62. Exposure to heavy metals should be avoided and minimized. So, the presence of heavy metals at detectable and significant levels in the Products is important to consumers. Based on the Products' packaging and advertising, reasonable consumers did not expect that the Products contained or risk containing detectable and significant levels of heavy metals.

**G.    Defendant's Duty to Disclose.**

63. Defendant was obligated to disclose that the Products contained or risk containing detectable and significant levels of heavy metals because that information is contrary to the Products' labeling and advertising.

22

64.    Defendant could have and should have prominently disclosed the limitations and omitted facts on packaging or at the point of sale—all prior to purchase. Had Defendant disclosed that the Products contain or risk containing detectable or significant levels of heavy metals, consumers would have been aware of it.

65.    <u>Superior Knowledge</u>: Defendant is experienced in the design and manufacture of protein supplements like the Products at issue. On information and belief, as a manufacturer and company whose goal is to improve health through premium protein products, Defendant is aware of the raw inputs used to manufacture the Products and, thus, was aware that the Products were manufactured with significant levels of heavy metals present in the finished Products. Further, on information and belief, and as explained above, Defendant conducts tests, including pre-sale testing, to verify the contents and specifications of the Products sold. Before purchasing the Products, consumers had no reasonable way to know the Products contained detectable or significant levels of heavy metals. Consumers also had no way to know the Products posed a health risk when consumed regularly based on the cumulative amounts of heavy metals ingested.

66.    <u>Contrary/Partial Representations</u>: As explained above, Defendant describes the Products on packaging and advertising as "safe to swallow," "no artificial sweeteners," "Build good oral care habits," "thoughtfully formulated with high quality ingredients," "vegan," "no bad stuff allowed," "only good stuff allowed," "no artificial sweeteners," "no dyes," "no parabens," and/or "no titanium dioxide," yet Defendant fails to disclose the presence (or risk of presence) of detectable, significant or unsafe levels of heavy metals. By disclosing some beneficial attributes about the Products' safety and expected performance, and by describing the absence of negative and undesirable attributes, Defendant is obligated to disclose material limitations that negatively affect the use of the Products. As explained above, based on the partial representations, consumers

believe the Products do not contain detectable, significant, or unsafe levels of heavy metals like lead and mercury.

67.    Defendant knows that reasonable consumers would find the presence or material risk of heavy metals and other toxins in premium protein powder supplements material.

**H.    Plaintiff's Experience.**

*Plaintiff Keith Prokup*

68.    Plaintiff Prokup purchased a recurring subscription of Huel Protein Black Edition Chocolate on or about June 10, 2024 from Huel.com. Between June 10, 2024 and August 31, 2025, he ordered the Huel Protein Black Edition Chocolate from Huel.com approximately 22 times.

69.    Representative examples of the Products' advertising and packaging are shown in paragraph 54, above.

70.    Before purchasing the Products, Plaintiff viewed the portions of the Huel.com webpage containing descriptions the Products' beneficial attributes and absence of negative attributes. He also viewed the packing before his recurring purchases. And he understood the Huel brand to be offering only healthy and health-conscious products. Accordingly, as shown above, he saw that the Products were generally described as: "all the nutrients you need," "nutritionally complete," "contains all 27 essential vitamins and minerals," "no nonsense," "non-GMO," "no artificial sweeteners," "161 health benefits," "all the carbohydrates, protein, fats, fiber, and all 27 essential micronutrients your body needs to thrive," "nutritionally complete powdered food with natural flavors and natural sweetener," and "nutritionally complete meal"—or substantively similar statements with minor variations.

71.    Plaintiff understood these statements by Defendant as representing that the Products (1) did not contain or risk containing heavy metals in any amount, (2) were free from

significant levels of toxins like heavy metals, and (3) could not materially increase negative health risks associated with heavy metals exposure if consumed regularly.

72.    Plaintiff relied on these representations in deciding to purchase the Products.

73.    Plaintiff would not have purchased the Products, or at minimum would have paid less for them, had he known that the Products contained (or risked containing) any amount of heavy metals like lead and mercury.

74.    Plaintiff would not have purchased the Products, or at minimum would have paid less for them, had he known that the Products contained (or risked containing) significant or unsafe levels of heavy metals like lead and mercury.

75.    Plaintiff would not have purchased the Products, or at minimum would have paid less for them, had he known that the Products can materially increase negative health risks associated with heavy metals exposure if consumed regularly.

76.    Plaintiff would not have purchased the Products, or at minimum would have paid less for them, had he known that the Products contained (or risked containing) heavy metals in excess of thresholds deemed safe by healthcare industry advocates.

77.    The Products were not, in fact, truthfully advertised. Each Product Plaintiff purchased was worth less than the purchase price because it either contained or risked containing detectable, significant, and/or dangerous levels of heavy metals.

78.    Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's deceptive and unfair conduct.

79.    Plaintiff continues to be interested in purchasing Huel-brand protein powders that do not contain or risk containing detectable or significant levels of heavy metals, but will be unable to trust and rely on Defendant's packaging, and so will not purchase Defendant's Products. Plaintiff

would be willing to purchase the Products again with the assurance that Defendant does not omit the presence of heavy metals on labeling, and that the Products do not contain or risk containing detectible or significant levels of heavy metals.

## V.    CLASS ACTION ALLEGATIONS

80.    Plaintiff brings this action on behalf of himself and all persons similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, and seeks certification of the following class:

**Illinois Class:**
All persons in Illinois who purchased one or more Products during the Class Period.

81.    The Illinois Class is referred to as the "Class." Excluded from the Class are the Defendant, the officers and directors of the Defendant, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which either Defendant has or had a controlling interest.  Also excluded from the Class are persons who purchased the Products for purposes of resale.

82.    The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, discovery, concealment, and accrual issues, and ending on the date the class is certified.[43]

83.    Plaintiff reserves the right to expand, limit, modify, or amend the class definition stated above, including the addition of one or more subclasses, in connection with a motion for class certification, or at any other time, based upon, among other things, changing circumstances,

---

[43] The Class Period begins at minimum 3 years from the date of filing of this action, but based on tolling, may extend beyond that date.

or new facts obtained during discovery. This includes subclasses based on individual products and sales channels.

84.    **Numerosity.** The Class is so numerous that joinder of all members in one action is impracticable. The exact number and identities of the members of the Class is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, but on information and belief, Plaintiff alleges that there are in excess of 100,000 members of the Class.

85.    **Typicality.** Plaintiff's claims are typical of those of other members of the Class, all of whom have suffered similar harm due to Defendant's course of conduct as described herein.

86.    **Adequacy of Representation.** Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class. Plaintiff has retained attorneys who are experienced in the handling of complex litigation and class actions, and Plaintiff and counsel intend to diligently prosecute this action.

87.    **Existence and Predominance of Common Questions of Law or Fact.** Common questions of law and fact exist as to all members of the Class that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary among members of the Class, and which may be determined without reference to the individual circumstances of any member of the Class, include, but are not limited to, the following:

    a.  Whether the Defendant manufactured, distributed, advertised, marketed, and/or sold the Products.

    b.  Whether the Products contain or risk containing detectable and significant levels of lead or cadmium.

    c.  Whether the Products contain or risk containing unsafe levels of lead or cadmium

d.  Whether the levels of lead or cadmium in the Products can increase the negative health risks associated with ingesting heavy metals.

e.  Whether Defendant knew or should have known the Products contained or risked containing significant or unsafe levels of lead or cadmium.

f.  Whether a reasonable consumer would consider the presence of the heavy metals described herein to be material.

g.  Whether Defendant misrepresented the Products to be of a particular standard or quality.

h.  Whether Defendant intended not to sell, manufacture, or distribute the Products as advertised and labeled.

i.  Whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are deceptive.

j.  Whether Defendant was unjustly enriched as a result of the unlawful conduct alleged herein such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiff and the Class.

k.  Whether Defendant intentionally or recklessly omitted and/or failed to disclose material facts.

l.  Whether Defendant concealed that the Products contain or risk containing the significant and unsafe levels of heavy metals described herein.

m. Whether Plaintiff and the Class are entitled to damages, restitution, and disgorgement from Defendant.

n.  Whether injunctive relief is appropriate and necessary to enjoin Defendant from continuing to supply the Products as manufactured and advertised.

88. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable. Requiring each individual class member to file an individual lawsuit would unreasonably consume the amounts that may be recovered. Even if every member of the Class could afford individual litigation, the adjudication of at least tens of thousands of identical claims would be unduly burdensome to the courts. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the conduct of this action as a class action, with respect to some or all of the issues presented herein, presents no management difficulties, conserves the resources of the parties and of the court system, and protects the rights of the members of the Class. Plaintiff anticipates no difficulty in the management of this action as a class action. The prosecution of separate actions by individual members of the Class may create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of the other members of the Class who are not parties to such adjudications, or that would substantially impair or impede the ability of such non-party Class members to protect their interests.

89. **Substantial Similarity**. On information and belief, the Products at issue in the action are substantially similar in all material respects. Namely, the Products consist of substantially the same ingredients and source materials, contain or risk containing the same or similar levels of heavy metals, are manufactured using the same or similar raw inputs, and are produced using the same or similar manufacturing processes. Additionally, the Products' labeling and advertising all misrepresent the Products as free of harmful ingredients like heavy metals, free of significant levels of heavy metals, and safe for ordinary and regular use, and fail to disclose that

the Products contain (or risk containing) significant and unsafe levels of heavy metals contrary to advertising. The Products are also all sold, manufactured, distributed or otherwise supplied by Defendant.  And Consumer Reports' testing "found no meaningful difference between the average detectable lead level of the vanilla-flavored products and the average detectable lead level of the chocolate-flavored products."

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS AND DELAYED DISCOVERY

90.    All applicable statutes of limitations have been tolled by the delayed discovery doctrine.  Plaintiff and Class Members could not have reasonably discovered Defendant's practice of introducing Products latent with toxic substances at significant and unsafe levels into the marketplace, at any time prior to commencing this class action litigation.

91.    A reasonable consumer purchasing Defendant's Products would simply believe that the Products are free of detectable, significant, and unsafe levels of heavy metals linked to cancers and diseases. Nothing in Defendant's marketing or advertising of the Products would lead a reasonable consumer to suspect the existence or potential existence of carcinogenic or highly toxic ingredients, let alone at significant and dangerous levels.

92.    No reasonable consumer could have independently discovered that Defendant's Products are latent with toxins, including at dangerous levels. Like Plaintiff, the reasonable consumer does not have access to sophisticated scientific resources, nor is the reasonable consumer trained to test the Products for toxins and evaluate their comparative safety. Relying on Defendant's representations of the quality and characteristics of the Products as safe for ordinary use, Plaintiff nor any reasonable consumer knew such scientific testing was needed.

93.    Plaintiff did not learn of the presence or potential presence of heavy metals as alleged herein until shortly before commencing this action.

94.    As a result, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

**FIRST CAUSE OF ACTION**

**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT**

**815 ILCS 505/1**

95.    Plaintiff restates the preceding allegations as if set forth herein.

96.    Plaintiff and Defendant are "persons" within the meaning of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 Ill. Comp. Stat. §505/1(c).

97.    The Products are "merchandise" within the meaning of 815 Ill. Comp. Stat. §505/1(b).

98.    There was a sale of merchandise within the meaning of 815 Ill. Comp. Stat. §505/1(d).

99.    Reasonable consumers are likely to be deceived by Defendant's conduct as alleged above.

100.    As detailed above, the representations on labeling and in advertising, taken individually and/or collectively, lead reasonable consumers to believe that the Products (1) did not contain or risk containing heavy metals in any amount, (2) were free from significant levels of toxins like heavy metals, and (3) could not materially increase negative health risks associated with heavy metals exposure if consumed regularly.

101.    In truth, the Products contain or risk containing detectable and significant levels of heavy metals. Additionally, the Products can materially increase negative health risks associated with heavy metals exposure if consumed regularly.

102.    A significant portion of the general consuming public or of targeted consumers, acting reasonably under the circumstances, would be misled by Defendant's representations and omissions of the Products' qualities and characteristics.

103.    Reasonable consumers do not expect a premium protein supplement company would encourage exposure to high levels of heavy metals like lead and cadmium regularly. Heavy metals provide no benefits and should be avoided.

104.    Reasonable consumers consider the presence of heavy metals a material fact when choosing premium protein supplement products, like the Products, which are advertised as not having various negative attributes.

105.    Defendant also omitted and failed to disclose material information that is contrary to Defendant's affirmative representations.[44] Specifically, Defendant failed to disclose that the Products contain or risk containing detectable and significant levels of heavy metals. Defendant could have and should have prominently disclosed the omitted information on labeling and point-of-sale advertising. Had Defendant disclosed the omitted information, Plaintiff and reasonable consumers would have been aware of it.

106.    As such, Defendant's deceptive acts are likely to mislead consumers acting reasonably under the circumstances. Defendant is aware of the raw inputs used to manufacture the

---

[44] For clarity, the omission claims in this Complaint are not based on any failure to disclose heavy metals in the "ingredients list" section of packaging. Plaintiff alleges any disclosures should have been provided elsewhere on labeling and in advertising.

Products and therefore is aware of the overall quality and characteristics of its products. Yet, Defendant represents to consumers that the Products have qualities or characteristics they do not and/or makes material omissions to induce consumer purchase.

107.    Absent Defendant's misrepresentations, Plaintiff and the Class would not have purchased the Products they purchased from Defendant, or, at minimum, they would not have paid as much for the Products as they ultimately did. Plaintiff and the Class's reliance was a substantial factor in causing them harm.

108.    Plaintiff and the Class would not have purchased the Products, or at minimum would have paid less for them, had they known that the Products contained (or risked containing) any amount of heavy metals like lead and cadmium.

109.    Plaintiff and the Class would not have purchased the Products, or at minimum would have paid less for them, had they known that the Products contained (or risked containing) significant or unsafe levels of heavy metals like lead and cadmium.

110.    Exposure to heavy metals should be avoided and minimized, and disclosure of the presence of heavy metals in products intended to be used regularly is material.

111.    Had the omitted information been disclosed, Plaintiff and the Class would have been aware of it and reasonably would have behaved differently. Among other things, they would not have purchased the Products they purchased from Defendant, or, at minimum, would not have paid as much for the items as they did.

112.    As a result of Defendant's fraudulent and unfair business acts and practices, Defendant has and continues to fraudulently obtain money from Plaintiff and members of the Class.

## FIFTH CAUSE OF ACTION

### UNJUST ENRICHMENT/QUASI-CONTRACT

113.    Plaintiff restates the preceding allegations as if set forth herein.

114.    By its wrongful acts and omissions, Defendant was unjustly enriched at the expense of and to the detriment of Plaintiff and the Class and/or while Plaintiff and the Class were unjustly deprived. Defendant's unlawful and deceptive misrepresentations induced Plaintiff and the Class to spend money they otherwise would not have spent and/or purchase items they otherwise would not have purchased.

115.    Plaintiff and members of the Class also conferred a monetary benefit on Defendant in the form of Defendant's profits generated by the deceptive misrepresentations and omissions. Defendant profited from making false representations and omissions of material fact.

116.    On behalf of the Class, Plaintiff seeks restitution from Defendant and an order disgorging all payments and profits obtained by Defendant from Plaintiff and the Class.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the proposed Class, respectfully prays for following relief:

a.    Certification of this case as a class action on behalf of the proposed Class and any subclasses defined above, appointment of Plaintiff as Class representative, and appointment of counsel as Class counsel;

b.    An award to Plaintiff and the proposed Class and subclasses of restitution and/or other equitable relief, including, without limitation, restitutionary disgorgement of all profits Defendant obtained from Plaintiff and the proposed Class as a result of its unlawful, unfair and fraudulent business practices described herein;

 c. An injunction ordering Defendant to cease advertising the Products with the misrepresentations and omissions complained of herein;

 d. An award of all economic, monetary, actual, consequential, and compensatory damages caused by Defendant's conduct where available;

 e. An award of nominal, punitive, and statutory damages where available;

 f. Reasonable expenses and attorneys' fees where available;

 g. Pre- and post-judgment interest, to the extent allowable; and

 h. For such further relief that the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of the proposed Class, demands a trial by jury for all claims so triable.

Dated: October 31, 2025

By: */s/  Vicki J. Maniatis*

Vicki J. Maniatis (NYS Bar #2578896)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
405 East 50th Street
New York, New York 10022
Tel.: (516) 491-4665
vmaniatis@milberg.com

Alexander E. Wolf (*pro hac vice* forthcoming)
awolf@milberg.com
**MILBERG, PLLC**
280 South Beverly Drive, Penthouse
Beverly Hills, California 90212
Tel: 872-365-7060

William J. Edelman (*pro hac vice* forthcoming)
wedelman@milberg.com
**MILBERG, PLLC**
227 W. Monroe Street, Ste 2100
Chicago, IL 60606
Tel: 866-252-0878